**NATIONAL WILDLIFE FEDERATION,**
**Plaintiff–Appellee,**

v.

**CONSUMERS POWER COMPANY,**
**Defendant–Appellant.**

No. 87–1441.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 18, 1987.

Decided Dec. 1, 1988.

Robert A. Fineman, Honigman, Miller, Schwartz, and Cohn, Detroit, Mich., Joseph M. Polito, Jay E. Brant, argued, A.T. Udrys, Consumers Power Co., Jackson, Mich., for defendant-appellant.

Mark Van Putten, argued, Ann Arbor, Mich., for plaintiff-appellee.

Douglas A. Cohen, Policy, Legislation, and Special Litigation Section, Land & Nat-

ural Resources Div. Dept. of Justice, Washington, D.C., amicus curiae U.S.

Steven J. Koorse, Hunton & Williams, Richmond, Va., amicus curiae Elec. Utilities.

Before JONES, WELLFORD, and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

Defendant-appellant Consumers Power Company (Consumers) appeals from the district court order requiring it to apply for a permit, pursuant to § 402 of the Clean Water Act (CWA), 33 U.S.C. § 1342, for the Ludington hydro-electric facility's release of turbine generating water containing entrained fish (live and dead fish, and fish remains) into Lake Michigan. The facility is jointly owned by Consumers (51%) and Detroit Edison Company (49%). The court held that the Ludington facility's release of turbine generating water containing entrained fish is subject to the CWA's National Pollutant Discharge Elimination System (NPDES) permit requirements. 33 U.S.C. § 1342. The district court's decision is reported as *National Wildlife Federation v. Consumers Power Company*, 657 F.Supp. 989 (W.D.Mich.1987). In a complaint filed in district court on November 22, 1985, NWF alleged that Consumers was operating its Ludington hydro-electric facility in violation of the CWA because the turbine generating water release at that facility contained entrained fish not authorized by the current NPDES permits for that facility. NWF brought the action as a citizen suit under CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1).

After a motion from NWF for partial summary judgment respecting liability, and a cross-motion for dismissal and/or summary judgment from Consumers, the district court, in an Opinion and Order issued on March 31, 1987, held that Consumers was in violation of the CWA for the reasons stated in the complaint. The court ordered Consumers to apply to the Michigan Water Resources Commission (MWRC) within 60 days from the date of the Order for the proper NPDES permit authorizing

the release of entrained fish into Lake Michigan. Consumers appealed to this court, and the district court stayed the remedial phase of the case pending decision by this court. After consideration of the parties' briefs and the supporting record, we reverse because the Ludington facility's movement of pollutants already in the water is not an "addition" of pollutants to navigable waters of the United States. *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 174–75 (D.C.Cir.1982).

I

The Ludington facility is one of the largest pumped storage facilities in the world, which can move in one day more than 20 billion gallons of water between its manmade reservoir and Lake Michigan. *Consumers Power Company*, 657 F.Supp. at 993. It is located in Mason County, Michigan, on the eastern shore of Lake Michigan, about four miles south of Ludington. It consists of two widely separated jetties projecting into Lake Michigan. Between the jetties are the water diversion structure and a building that houses six large reversible pump/turbines which, when pumping, move Lake Michigan water uphill through six large penstocks into a manmade reservoir or impoundment. The six penstocks are very large pipes connecting the reservoir and the pump/turbines. Each penstock is 1,100 feet long and tapers from 28 to 24 feet as it approaches the pump/turbines. To these six penstocks are connected twelve intake/discharge openings with two openings per penstock. The reservoir, located on a dune about 400 feet above and 900 feet east of Lake Michigan, is approximately 1.3 square miles in area and, when filled to capacity, holds 27 billion gallons of water.

The facility generates power by letting the water from the reservoir flow through the turbines, and then back into Lake Michigan. The facility operates essentially as a storage battery, storing energy in a large quantity of water held at a height of 400 feet above Lake Michigan. This stored energy is released from the water when grav-

ity forces the water downhill through the penstocks to turn the pump/turbines.

Fish and other aquatic organisms enter this power generation system when the facility, during normal operation, moves the waters of Lake Michigan into the reservoir. During diversion or pumping operations, the facility causes fish and other aquatic organisms to be carried through the system ("entrained") owing to the moving force of the water. As all parties in this lawsuit concede, a substantial number of the fish and other aquatic organisms are destroyed during the normal pump-storage operations of the facility. Some percentage of the fish and other aquatic organisms, however, survive and are released back into Lake Michigan.

Under the Michigan Water Resources Act, Mich.Comp.Laws Ann. §§ 323.1 et seq., and Section 402 of the CWA, 33 U.S.C. § 1342, the Michigan Water Resources Commission (MWRC) has issued two NPDES permits to Consumers for what is called "operational wastewater discharges" from the facility into Lake Michigan. As explained below, operational wastewater is distinguishable from the turbine generating water on the ground that the former contains pollutants from outside the hydroelectric power generation system. Neither 402 permit has regulated the release of pollutants in the turbine generating water of the facility. Consumers now operates the Ludington facility under a 1969 license as required by the Federal Power Act, 16 U.S.C. § 791a et seq., which was issued by the Federal Power Commission, predecessor of the current Federal Energy Regulatory Commission (FERC).

## II

Generally, the objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251. The CWA establishes a comprehensive statutory system for controlling water pollution. To that end, it establishes the § 402 NPDES permit system for regulating discharges of pollutants into waters of the United States. The Dis-

trict of Columbia Circuit Court of Appeals recently indicated that "the cornerstone of the Clean Water Act's pollution control scheme is the National Pollution Discharge Elimination System (NPDES) permit program...." *Natural Resources Defense Council, Inc. v. EPA*, 822 F.2d 104, 108 (D.C.Cir.1987). The United States Environmental Protection Agency (EPA) is principally responsible for administering the NPDES permit system, and it may lawfully delegate permit issuing authority to state government. CWA § 402(b), 33 U.S.C. § 1342(b).

The CWA has been held to divide the sources of water pollution into categories: "point source," 33 U.S.C. § 1362(14); and "nonpoint source." 33 U.S.C. § 1288. As the *Gorsuch* court explained, "[t]he latter category is defined by exclusion and includes all water quality problems not subject to § 402." 693 F.2d at 166 (footnote omitted). The NPDES permit program was designed to control "point sources" of pollution, and the legislative history behind CWA indicates that Congress's focus was on the discharge of traditional industrial and municipal wastes. *Id.* at 175.

Under § 402, an NPDES permit is required for the "discharge of a pollutant" from a "point source." 33 U.S.C. § 1342. Unless the EPA issues an NPDES permit, "the discharge of any pollutant by any person [is] unlawful." CWA § 301(a), 33 U.S.C. § 1311(a). Where the source of a pollutant is a point source, and the pollutant is discharged into navigable waters, the source *must* obtain a § 402 permit limiting and controlling both the amount and type of pollutants which can be lawfully discharged. The general prohibition of CWA § 301(a) regarding point source pollution is self-executing. *United States v. Frezzo Brothers, Inc.*, 602 F.2d 1123, 1127 (3rd Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). In order to avoid liability under § 301(a), a polluter must apply for and obtain an NPDES permit from the EPA, or from an authorized state water pollution control agency. EPA, or an authorized state agency, may in its discretion exempt a specific

pollutant discharge from § 301(a)'s general prohibition by issuing an NPDES permit. Alternatively, the agency may choose not to issue such a permit, leaving the discharge unlawful under § 301(a). We have indicated that "[u]nder § 402(a)(2) of the Act, 33 U.S.C. § 1342(a)(2), the Administrator of EPA is required to prescribe the conditions of such permits and to assure compliance with those conditions and other requirements of the Act." *United States ex rel. Tennessee Valley Authority v. Tennessee Water Quality Control Board,* 717 F.2d 992, 998 (6th Cir.1983).

Section 502(12) of the CWA, a key portion of the statute, defines the term "discharge of pollutants" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). The District of Columbia Circuit has held that for NPDES requirements to apply to any given set of circumstances, "five elements must be present: (1) a *pollutant* must be (2) *added* (3) *to navigable waters* (4) *from* (5) *a point source.*" *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 165 (D.C.Cir.1982). We now analyze the Ludington facility's release of turbine generating water containing entrained fish under this framework.

### III

CWA § 502(6) defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). Millions of pounds of live fish, dead fish and fish remains annually discharged into Lake Michigan by the Ludington facility are pollutants within the meaning of the CWA, since they are "biological materials." 657 F.Supp. at 1006–07. *See also Association of Pacific Fisheries v. Environmental Protection Agency,* 615 F.2d 794 (9th Cir.1980).

"Point source" is defined by CWA § 502(14) as "any discernible, confined and discrete conveyance, including but not lim-

ited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling rock, concentrated animal feeding operation, or vessel or other floating craft, *from which pollutants are or may be discharged.*" 33 U.S.C. § 1362(14) (emphasis supplied). The district court found that the Ludington facility's release of turbine generating water containing entrained fish through its six penstocks constitutes a discharge from a "point source." In the district court's view, the six penstocks of the Ludington facility constituted " 'discernible, confined and discrete conveyance[s],' and hence [were] point sources under the Act," 657 F.Supp. at 1007.

Consumers argues on appeal, however, that under CWA § 304(f)(2)(F), 33 U.S.C. § 1314(f)(2)(F), the release of turbine generating water containing entrained fish in the instant case is not a "discharge" as required by the definition of "point source" in CWA § 502(14). Thus, it argues, the Ludington facility, at least in respect to its turbine generating water, is not a "point source."

CWA § 304(f)(2)(F) gives the EPA the power to issue guidelines for *identifying* and evaluating the nature and extent of nonpoint sources of pollutants, and the processes, procedures, and methods to control pollution resulting from "changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities." 33 U.S.C. § 1314(f)(2)(F). In support of Consumers's position on this issue, EPA argues vigorously that for something to qualify as a "point source," a "discernible, confined and discrete conveyance" must *"discharge"* pollutants, CWA § 502(12) (emphasis supplied). To discharge a pollutant under the CWA, EPA argues as it had in *Gorsuch,* 693 F.2d at 174–75, that a facility must "add" pollutants to navigable waters of the United States. Unless the Ludington facility's penstocks "add" pollutants to waters of the United States, those penstocks would not be, in the EPA's view, point sources.

In our view, this reasoning is circular, inasmuch as it presupposes that "point source" may not be defined independently of "addition." However, we need not decide whether all point sources add pollutants in the instant case. Since "addition" is one of the five elements necessary to trigger the NPDES permit requirement, we need only address whether the Ludington facility "adds" pollutants from the outside world to Lake Michigan.

In *Gorsuch*, the District of Columbia Circuit addressed the issue of whether water quality changes caused by dams must be regulated under the NPDES system. 693 F.2d at 164. As the district court in the instant case recognized, *Gorsuch* did not concern "whether a dam is a point source but rather whether the water quality changes at issue in the case were pollutants and whether the dam *added* such changes to the water," 657 F.Supp. 1005-06 (emphasis supplied). The water quality changes involved in *Gorsuch* were "low dissolved oxygen," 693 F.2d at 161-62, "dissolved minerals and nutrients," *id.* at 163, "temperature changes," *ibid.*, "sediment," *id.* at 163-64, and "supersaturation," *id.* at 164. Although the court did not focus on a particular dam, it did have in mind the typical storage dam that held water in a reservoir, and then at some point released that water into another body of water. The court clearly indicated that "dams" covered hydro-electric power dams when it stated that dams "provide a clean source of electric power." *Ibid.* The EPA argued in *Gorsuch*, as it does here, that for NPDES requirements to apply, dam-caused water quality changes must result from the *addition* of pollutants. EPA also argued, ,as it does here, that there can be no addition unless a source "physically introduces a pollutant into water from the outside world." *Id.* at 175. The *Gorsuch* court reviewed whether EPA's construction of the term "added" was reasonable. *Id.* at 174-75. It found that CWA logically permitted EPA's construction of "added," that Congress had in all likelihood given the EPA discretion to define the term "added," and that the EPA construction was not "manifestly unreasonable." *Id.* at 175.

If a statute is silent or ambiguous on a specific question, a reviewing court must defer to any reasonable construction of that statute by the administering agency. *Chevron, U.S.A. v. NRDC*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Under *Chevron* a reviewing court must determine "whether the agency's answer [to the ambiguous question] is based on a permissible construction of the statute." *Ibid.* The agency's construction need not be the one the court itself would adopt or the one the court feels would best implement congressional policy. It need only be a reasonable construction of the statutory question at issue. *Id.* at 844-45, 104 S.Ct. at 2782-83. We agree with the District of Columbia Circuit that EPA's definition of "added" as the introduction of a pollutant to water from the outside world is a permissible construction of "added," and that there are no compelling indications either in the statutory scheme, the legislative history, or anywhere else, that such a construction is wrong. *Gorsuch*, 693 F.2d at 175. EPA's construction is entitled to deference for the additional reason that the EPA is principally responsible for administering the NPDES system, and that "Congress generally intended that EPA would exercise *substantial* discretion in interpreting the Act." *Id.* at 173 (emphasis supplied). " '[C]onstruction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....' " *E.I. du Pont de Nemours & Co. v. Collins*, 432 U.S. 46, 54-55, 97 S.Ct. 2229, 2234-35, 53 L.Ed.2d 100 (1977), quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969).

*Chevron* rejected a court's attempt at redefining an undefined statutory term in terms of the "general purpose" of the statute, when the agency has already defined the term. 467 U.S. at 845, 104 S.Ct. at 2783. While the district court indicated an acceptance of the EPA definition, 657 F.Supp. at 1007-08, it nonetheless redefined "addition" pursuant to its view of the general purpose of the CWA. The district

court's statement that "plaintiff's position is more in accord with the Act's purposes and does not conflict with EPA's interpretation of the Act" is evidence of this. 657 F.Supp. at 1008. Instead of deferring to consistent EPA policy on dam-caused pollution, *TVA*, 717 F.2d at 999, and its reasonable construction of the key statutory term "addition" upheld in *Gorsuch*, 693 F.2d at 175, the district court instead interpreted and applied the term "added" in accordance with its own vision of the Act. If Congress gave the EPA reasonable discretion to define the terms "point source" and "pollutant," it also gave the EPA similar discretion to define "addition." *Ibid.* Had the district court accorded the proper deference to the EPA, its reasonable policy respecting hydro-electric power dams, and its reasonable construction of "addition," it would have concluded that no pollutant is introduced from the outside world because any entrained fish released with the Ludington facility's turbine generating water originate in Lake Michigan, and do not enter the Lake from the outside world.

The EPA points out that when fish are removed from the waters of the United States, and subsequently dead fish or fish parts are released into the waters, an "addition" of pollutants occurs. This happens in the case of "seafood processors." Fish are first removed from waters of the United States by fishermen, and then given to a seafood processing plant. The seafood processors process the fish, and then dispose of the fish processing waste in waters of the United States. Indeed, EPA has issued effluent guidelines covering discharges by seafood processors, 40 C.F.R. Part 408 (1986); *see also Association of Pacific Fisheries*, 615 F.2d at 801. In contrast, the Ludington facility never removes the fish from waters of the United States.

The district court held, however, that an "addition" occurs because the Ludington "facility's turbines ... *create* the pollutant," 657 F.Supp. at 1008 (emphasis supplied). This logic, however, does not distinguish the Ludington facility's release from the releases from dams already found by other federal courts not to be covered by the CWA § 402 NPDES permit require-

ments. *E.g., Gorsuch*, 693 F.2d at 174–75 (dissolved minerals, nutrients, heat, and sediment, were pollutants created by storage dam, but such pollutants in the water were not "added" when water was released into surrounding water). To be sure, the manipulation of water by the Ludington facility's turbine changes the form of the pollutant from live fish to a mixture of live and dead fish in the process of generating electricity. However, this does not mean that the Ludington facility "adds" a pollutant to Lake Michigan. Indeed, the district court admitted as much in stating that "[t]he facility arguably does not add a pollutant to Lake Michigan from the outside world." 657 F.Supp. at 1008. Moreover, under the CWA, live fish would be just as much a pollutant as a mixture of live and dead fish. The district court conceded this by stating that "[f]ish, moreover, constitute biological materials, and therefore clearly fall within the definition given in section 1362(6)." 657 F.Supp. at 1007. There can be no doubt that the Ludington facility does not create the fish which become entrained in the process of generating electricity. If the district court decision were upheld, a § 402 permit would be required even for a dam which released alive all fish passing through it from and into waters of the United States, since the CWA does not distinguish between living and dead "biological materials."

Just as in *Gorsuch* the release of storage dam water low in dissolved oxygen, and containing heat, dissolved minerals and nutrients, and sediment did not constitute an addition of a pollutant to navigable waters, so in the instant case the release of turbine generating water containing entrained fish does not constitute the addition of any pollutant to navigable waters. Storage dams, such as those contemplated in *Gorsuch*, actually transform the essential character of the water for its biological inhabitants. They change water that is high in plant nutrients and organic waste into water that is colder and has low dissolved oxygen, as well as increased amounts of sediment and dissolved minerals. The Ludington facility, in the process of generating electricity,

transforms water containing live fish into water containing live and dead fish. The fish originate in Lake Michigan, and any resulting pollution in the form of entrained fish is, as in *Gorsuch*, an inherent result of dam operation. Any water quality change resulting from the release of entrained fish at the Ludington facility is simply not, giving proper deference to the EPA definition, from the physical introduction of a pollutant from the outside world.

Had Congress wanted to use CWA § 402 to regulate all sources of pollution, "'it would easily have chosen suitable language, *e.g.*, all pollution released through a point source.'" *Gorsuch*, 693 F.2d at 176. Instead, Congress chose the word "addition." We agree with the District of Columbia Circuit that "the NPDES system was limited to 'addition' of 'pollutant' 'from' a point source." *Ibid.* Dams, under certain circumstances, may "add" pollutants from the outside world, such as when they discharge grease into water passing through the outlet works. *Gorsuch*, 693 F.2d at 195 n. 22.

In short, Congress and everyone involved in the water pollution problem knew that water flowed out of dams, and that such water was often not pristine. To the extent that no more has been shown than that unclean water flows out of the dam, Congress clearly displayed an intention to exempt dams from the Clean Water Act. However, if the dam itself added pollutants to the water, rather than merely transmitting the water coming into it, in whatever altered form, then it would be subject to the NPDES permit system. The district court concluded that since a permit is required for the Ludington facility's discharges of "pollutants in its noncontact cooling water, oil separator water, and turbine pit dewatering water ...," 657 F.Supp. at 1009, it would be illogical for the EPA not to require permits for the release of entrained fish in the turbine generating water. However, the forms of pollution enumerated by the district court regulated under the category of "wastewater" are distinguishable from the pollutants moved and transformed in the turbine's manipulation of water, an essential and inherent operation of a hydro-electric power dam such as the Ludington facility. NPDES permits have been issued where, as part of the dam facility, a pipe discharges oil or sanitary wastes into water passing through the outlet works or where a dam has been constructed for the purpose of treating municipal wastes which are then discharged into navigable waters. *Gorsuch*, 693 F.2d at 165 n. 22. Oil, sanitary waste, and municipal waste are clearly introduced from the outside world. Similarly, as with the "wastewater" from the Ludington facility, these instances involve the introduction and distribution of wastes produced outside the waterways and hence are "added" to the waters of the United States. For the Ludington facility, the fish, both dead and alive, always remain within the waters of the United States, and hence cannot be added. EPA's § 402 treatment of the Ludington facility's wastewater, far from evincing irrational or arbitrary agency behavior, represents a reasonable distinction between those pollutants already in the water moved and transformed by the essential operation of a hydroelectric power dam and those waste products "added" to the water by tangential processes in generating electricity.

The district court attempted to distinguish *Gorsuch* on the ground that the Ludington facility involves "substances," whereas *Gorsuch* involved water "conditions." 657 F.Supp. at 1006. Such a distinction is irrelevant under the statute. A condition may be just as much a pollutant under CWA, as a substance. In the definition of pollutant, both "heat" and "biological materials" are included. That the Ludington facility releases water containing a substance—entrained fish—rather than water containing "heat" does not, for purposes of this analysis, change anything. Indeed, it is fair to say that the release of water containing heat could be quite harmful to the fishery resources inhabiting a lake, yet the harmful character still would not make the water and its contents an "addition" of pollutants into navigable waters of the United States.

In the district court's view, the Ludington facility "does not release the 'same biomass' it diverts from the Lake; it transforms the biomass from a living, useful form into a lifeless entity with no apparent value." 657 F.Supp. at 1006–7. However, this is what essentially happened in the *Gorsuch* case. While *Gorsuch* did not directly involve fish entrainment, the storage dam removed from the stream beneficial water with a high oxygen content, transformed it into water inimical to life, and yet § 402 permit requirements did not apply to such water.

## IV

EPA's construction of the statutory term "addition" is, in our view, rooted in the general congressional policy that NPDES permits are not required for dam-caused pollution. The EPA has consistently maintained that dam-induced water *quality changes* are not generally the result of the *discharge* of any pollutant. In 1982, the District of Columbia Circuit recognized that "EPA has never changed its basic position that dams generally do not require NPDES permits." *Gorsuch*, 693 F.2d at 168. In 1983, we indicated that "EPA has consistently treated dams as ... not subject to discharge permit requirements of section 402." *TVA*, 717 F.2d at 999. Eight months after CWA became law, EPA had declared that "we do not believe that the discharge from a dam constitutes a 'discharge of pollutants' within the meaning of the Federal Water Pollution Control Act." *Gorsuch*, 693 F.2d at 169 n. 39. In 1974 and 1978, the EPA reconsidered this position, and each time the EPA adhered to its conclusion. *Id.* at 169 n. 40. Entrained fish are an unfortunate aspect of the Ludington facility's generation of electricity, but do not require reversing the general EPA policy that dams do not require an NPDES permit.

Moreover, EPA has never required an NPDES permit for turbine generating water releases at thirty-four other pumped storage facilities. In the case of hydroelectric facilities which "directly impede the flow of a navigable stream" and whose "turbine generating water releases also may contain both dead and live aquatic organisms," the EPA has not required § 402 permits. Neither EPA nor MWRC has ever required Consumers to procure an NPDES permit for the Ludington facility's release of turbine generating water containing entrained fish.

As the *Gorsuch* court stated:

if dam-caused pollution was truly of major proportions, someone, be it EPA, the Wildlife Federation, or other environmental groups, would most likely have brought it to Congress' attention, either in 1972 or in 1977. And of course, the Wildlife Federation, if unhappy with our attempt to divine what Congress would have done about dam-caused pollution had it thought about it, is still free to seek a legislative solution. Unless and until Congress addresses the matter, we cannot say that the Act requires EPA to adopt the strictest possible regulatory solution.

693 F.2d at 183 (footnote omitted).

Although an essential element in a national effort to control water pollution, the NPDES permit program stands alongside of the system controlling "nonpoint sources" of pollution, i.e., all water pollution not subject to § 402. Congress apparently intended that pollution problems caused by dams and other flow diversion facilities are generally to be regulated by means other than the NPDES permit program. Section 304(f)(2)(F) provides that the EPA shall issue information on

(1) guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollutants, and (2) processes, procedures, and methods to control pollution resulting from ... (F) changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of *dams*, levees, channels, causeways, *or flow diversion facilities*.

33 U.S.C. § 1314(f)(2)(F) (emphasis supplied). As the district court recognized, the *Gorsuch* court interpreted this section to mean that Congress understood "that dams and other flow diversion devices can be

nonpoint sources of pollution, and intended to have the EPA regulate them by means in addition to the [NPDES] permit system." 657 F.Supp. at 1007. While we agree that "[i]t does not [necessarily] mean that Congress intended to exempt all of the activities listed in section 304(f) from the permit requirement," *ibid.* it does not, on the other hand, necessarily indicate that dam-caused pollution would be subject to § 402 permit requirements. Thus, we concur with the District of Columbia Circuit in this regard.

In *TVA*, we held that a state may not subject a federal agency to the requirements of its own discharge permit program when the pollution at issue is not "from the discharge of pollutants from a point source." 717 F.2d at 999–1000. There we stated that "EPA has consistently treated dams as nonpoint sources of pollution which are not subject to the discharge permit requirements of § 402." *Id.* at 999. We also stated that "[w]ater pollution arising from nonpoint sources is to be dealt with differently, specifically through the device of areawide waste treatment management by the states." *Ibid.* While *TVA* involved a "comparatively small quantity of water which seep[ed] through the dam" *ibid.*, this factual difference from the instant case (where a large amount of water is involved) is not material. In agreement with our analysis in *TVA*, other federal courts have generally held that the release of water from dams including hydro-electric facilities is not a point source discharge. *See, e.g., Missouri ex rel. Ashcroft v. Department of the Army*, 672 F.2d 1297, 1304 (8th Cir.1982) (soil erosion and diminution of oxygen content of the water caused by release of water from a dam not point source discharges).

To supplement the NPDES permit system, the Congress provided for state and local pollution control programs, the implementation of which EPA was to counsel. CWA, § 201, 33 U.S.C. § 1281; § 303, 33 U.S.C. § 1313. State water quality standards are the basis of the "nonpoint source" program. In the "nonpoint source" part of the CWA, Congress specifically refers to pollution resulting from dams, channels, flow diversion facilities, or other "changes in the movement, flow, or circulation of a navigable water." CWA § 304(f)(2)(F), 33 U.S.C. § 1314(f)(2)(F). This supports the District of Columbia Circuit's view that generally water quality changes caused by the existence of dams and other similar structures were intended by Congress to be regulated under the "nonpoint source" category of pollution. *Gorsuch*, 693 F.2d at 177. *See also* House Report No. 911, *reprinted in* Legislative History of the Water Pollution Control Act Amendments of 1972 at 796 (1973).

Recent congressional action supports this view of congressional intent. When Congress recently focused on the water pollution problems caused by dams in the Water Quality Act of 1987, P.L. 100–4, February 4, 1987, it did not refer to the NPDES program, or require NPDES permitting of dams in the amendment. Moreover, the Congress viewed the new nonpoint source provision as an important and integral component of the comprehensive system to reduce pollution in the navigable waters of the United States. Indeed, the Congress provided money to the states to implement nonpoint source control programs, and required them to report to the EPA on those waters which, without any further management and regulation of their nonpoint sources of pollution, would fail to meet either water quality standards or the goals and requirements of the CWA. Congress also required the states to submit to EPA a report outlining ways to deal best with specific classes of nonpoint source pollution.

### V

NWF argues that the district court is correct in distinguishing what the Ludington facility does to water from the effect of other hydropower generating facilities to which EPA has previously applied the "addition" test. Ludington is not a facility that "sit[s] in a natural streambed or involve[s] either a passive or pumped diversion." The district court found that Ludington "physically removes water from the Lake, holds it, discharges it back into the lake, and in the intake and discharge pro-

cess creates pollutants that were not in the water prior to its diversion." 657 F.Supp. at 1008. *TVA* is, in NWF's view, distinguishable on its facts insofar as the release of water was comparatively small in relation to the Ludington facility's release, and was caused by unintentional seepage through the dam, rather than deliberate discharge as in Ludington. *Gorsuch* is, from NWF's standpoint, also distinguishable because the releases at issue were from dams located within navigable waters, and the dams there "merely pass on water of already altered quality," in contrast to Ludington which takes in and then discharges water in an altered, polluted state. NWF argues that "this alteration of water quality during an active, temporal and spatial removal of water from Lake Michigan provides a principled basis for distinguishing the Ludington facility from other conventional dams which Consumers uses as the basis for its arguments." We find no useful distinction between these facilities for purposes of interpreting § 402 of the Clean Water Act.

The water which passes through the Ludington facility never loses its status as water of the United States. The district court stated that "[d]efendant [Consumers] argues cogently that the Lake water does not lose its status as navigable water simply because it is removed from the Lake, and since the fish never leave the Lake they cannot be added to it from the outside world." 657 F.Supp. at 1008. In *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court held that an artificially dredged pond connected to the Pacific Ocean constituted navigable waters of the United States for CWA regulatory purposes. EPA has defined waters of the United States as "impoundments of waters otherwise defined as waters of the United States under this definition." 40 C.F.R. § 122.2 (1986). Thus, the navigability in fact of waters is not a criterion for defining "navigable waters of the United States." Moreover, whether the water is subject to tidal action is not determinative of "navigable waters of the United States. For example, in *Leslie Salt Co. v. Froehlke*, 578 F.2d

742 (9th Cir.1978), the court held that the waters of diked salt ponds originating from San Francisco Bay were "navigable waters of the United States" though not subject to tidal action. We thus recognize that it was Congress's intent under the CWA that the term "navigable waters" be given the broadest possible constitutional interpretation. *United States v. Lambert*, 695 F.2d 536, 538 (11th Cir.1983). *See also United States v. Ashland Oil & Transportation Co.*, 504 F.2d 1317, 1324–25 (6th Cir.1974).

The Ludington facility's movement or diversion of water from Lake Michigan into a storage reservoir is distinguishable from the diversion of waters of the United States by industrial operations for cooling purposes in which the water loses its status as water of the United States. The Ludington facility merely changes the movement, flow, or circulation of navigable waters when it temporarily impounds waters from Lake Michigan in a storage reservoir, but does not alter their character as waters of the United States. On the other hand, steam/electric industrial operations remove water, which then enters the industrial complex and absorbs heat and other minerals produced by the plant or electric generator before being added to waters of the United States.

Moreover, hydro-electric power facilities, whether they are established squarely in a river bed, involve a passive diversion, or pumped movement of water, are fundamentally the same for purposes of the case at bar. They all manipulate waters of the United States to capture its energy to generate electricity. Electricity generation is accomplished by impounding water and then releasing that water through the impounding structure to turn the turbines in the structure to produce energy. Moreover, were we to adopt the proffered distinction, its application would have the effect of requiring the permitting of releases in the instant case but not in the case where an impounding structure is established squarely in a natural river bed.

Finally, the district court implicitly acknowledged that the Ludington facility is a dam, 657 F.Supp. at 1008. CWA has few

references to dam, and does not define "dam." However, FERC, under authority derived from the EPA, has consistently defined a "dam" as "any structure that impounds water." 18 C.F.R. 4.30(4); 18 C.F.R. 4.50(b)(1) (1983); 18 C.F.R. 4.91(c) (1983). In our view, the Ludington facility is a dam for purposes of the CWA, since it is a "structure that impounds water." Hence, it would be subject to the policy that dam-caused pollution is generally not subject to the NPDES permit requirements.

## VI

Our holding that the district court erred in failing to accord proper deference to EPA policy does not mean that the problem of hydro-electric power facility's impact on fishery resources will go unnoticed and unaddressed. The building and operating license issued for the Ludington facility by FERC under the Federal Power Act requires Consumers to conduct studies of the consequences of the project to fishing resources, and refers to the possibility of FERC orders modifying the facility's structure and operation for the conservation of fish affected by the plant. *Consumers Power Company & Detroit Edison Company*, 42 F.P.C. 274, 284–85 (1969).

Specifically, Articles 16, 37, and 38 of the current FPA license concern the facility's impact on the fishery resources. Article 16 essentially requires Consumers to maintain and operate the facility so as to conserve and develop the fish and wildlife resources of Lake Michigan, subject to any reasonable modification by FERC. Article 37 requires Consumers to conduct studies of the consequences of the facility's normal operation on fishery resources to modify its operation as may be required by FERC. Article 38 essentially requires Consumers to conduct studies on the adequacy of various kinds of fish barriers, making such modification as required by FERC to protect the fishery resources in the facility's area.

FERC's Office of Hydropower Licensing issued an order dated August 11, 1987, requiring Consumers to institute new measures limiting the fish mortality in the turbine generating waters. This order requires Consumers, *inter alia*, to establish a barrier net on the facility's tailrace, and to study the feasibility of installing permanent protection devices, or to operate the facility in ways reducing the fish mortality. After the district court's decision, an Order Modifying a Mitigative Plan for Turbine Mortality was issued. *Consumers Power Company, et al.*, Project No. 2680–002 (August 11, 1987). The order required interim action:

> The licensee should install barrier nets in the project tailrace as soon as possible to reduce injury and mortality of adult fish. Since most of the fish losses occur in the spring, summer and fall, the licensee should operate and maintain barrier nets in the project tailrace during these times until permanent fish protection measures are installed and are operating.

Thus, the absence of EPA regulations does not mean that there will be no regulatory oversight of the effect of the Ludington facility on fish resources. Indeed, one of the major purposes of the passage of the Federal Power Act, to which the Ludington facility is explicitly subject, was to provide a regulatory regime sensitive to problems affecting fishery resources in waters of the United States. EPA regulation would not add anything superior to existing FERC regulation in terms of knowledgeability or dedication to the fish.

## VII

Because the district court failed to accord proper deference to EPA policy, its role in administering the NPDES program, and its construction of the term "added," we therefore REVERSE and REMAND the case for proceedings consistent with this opinion.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

While I agree with the majority's conclusion that the district court was required to defer to the EPA's stated policies concerning water quality changes, neither those policies nor any of the cases cited by the majority concern a facility which removes

water, discharges it and, in the process, adds a foreign pollutant. More importantly, because I disagree with the majority's conclusion that the Ludington facility merely changes the movement, flow, or circulation of navigable waters, I cannot accept the majority's reliance on *Gorsuch*. In my view, the district court properly concluded that the Ludington "facility's turbines ... *create* the pollutant in the process of discharging the water into the Lake and generating electricity." 657 F.Supp. at 1008 (emphasis added). Since I cannot sufficiently distinguish the facility's discharge of dead fish and fish remains in its turbine generating water from its discharges of other pollutants, I would affirm the district court's order requiring Consumers to apply for a permit authorizing the release of dead fish into Lake Michigan. For these reasons, I respectfully dissent.