SUHRHEINRICH, Circuit Judge.
*438 I. INTRODUCTION
Defendant Tennessee Valley Authority ("TVA" or "Defendant") operates a coal-fired electricity-generating plant, the Gallatin Fossil Plant ("Gallatin plant"), on a part of the Cumberland River known as Old Hickory Lake, a popular recreation spot. The Gallatin plant generates wanted electricity (which it supplies to approximately 565,000 households in the greater Nashville area), as well as unwanted waste byproducts, in particular coal combustion residuals ("CCRs") or coal ash. The plant disposes of the coal ash by "sluicing" (mixing with lots of water) and allowing the coal ash solids to settle in a series of unlined man-made coal ash ponds adjacent to the river. The Gallatin plant has a permit to discharge some of this coal combustion wastewater, which contains heavy metals and other pollutants, into the river through a pipe, known as Outfall 001. Other wastewater is allegedly discharged through leaks from the ponds through the groundwater into the Cumberland River, a waterway protected by the Clean Water Act ("CWA"), 33 U.S.C. § 1251, et seq . The CWA indisputably regulates the first type of discharge. The issue on appeal is whether the CWA also regulates the latter type of discharge.
After a bench trial, the district court found that TVA violated the CWA because its coal ash ponds at the Gallatin plant leaks pollutants through groundwater that is "hydrologically connected" to the Cumberland River without a permit. This theory of liability has been labeled the "hydrological connection theory" by the Federal Environmental Protection Agency ("EPA"). As explained in the companion decision also issued today, Kentucky Waterways All., v. Kentucky Utilities Co. , No. 18-5115, --- F. 3d ----, 2018 WL 4559315 (6th Cir. 2018) (" Kentucky Waterways "), we find no support for this theory in either the text or the history of the CWA and related environmental laws. We therefore hold that the district court erred in granting relief under the CWA.
II. BACKGROUND
A. Statutory Background
Some background on the CWA is helpful. As explained in Kentucky Waterways, Congress passed the CWA in 1972 with the stated purpose of "restor[ing] and maintain[ing] the ... Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA requires a permit to "discharge ... any pollutant." Id. §§ 1311(a), 1342(a). The discharge of a pollutant is defined as "any addition of any pollutant to navigable waters from any point source." Id. § 1362(12)(A). Navigable waters are broadly defined as "the waters of the United States." Id. § 1362(7). And a point source is a "discernible, confined and discrete conveyance." Id. § 1362(14). These permits are issued pursuant to the CWA's National Pollutant Discharge Elimination System ("NPDES"). Id . § 1342. Therefore, in order to add a pollutant to the waters of the United States via a conveyance, an NPDES permit is required.
The CWA overhauled the 1948 Federal Water Pollution Control Act and the Water Quality Act of 1965 by shifting the focal point of liability from measuring excess pollution levels in the receiving water to capping effluent limitations from a discharging source. See S. Rep. No. 92-414 (1971), as reprinted in 1972 U.S.C.C.A.N.
*439 3668, 3675 ("Under [the CWA] the basis of pollution prevention and elimination will be the application of effluent limitations. Water quality will be a measure of program effectiveness and performance, not a means of elimination and enforcement.... With effluent limits, the [EPA] ... need not search for a precise link between pollution and water quality.").
With the CWA, Congress also sought to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution [and] to plan the development and use ... of land and water resources." 33 U.S.C. § 1251(b). The CWA accomplishes this by allowing the states to administer the CWA's NPDES permitting program themselves, provided their regulations are at least as stringent as the federal limitations, id. § 1342(b)-(d), and most notably, by drawing a line between point-source pollution and nonpoint-source pollution, id. § 1362(12),(14). Point-source pollution is subject to the NPDES requirements, and thus, to federal regulation under the CWA. But all other forms of pollution are considered nonpoint-source pollution and are within the states' regulatory domain. See id. §§ 1314(f), 1362(12); see also Nat'l Wildlife Fed'n v. Consumers Power Co. , 862 F.2d 580, 588 (6th Cir. 1988). Similarly, the CWA is restricted to regulation of pollutants discharged into navigable waters, id. § 1362(12), leaving the states to regulate pollution of non-navigable waters.
The EPA has the power under the CWA to issue orders and to bring civil and criminal actions against those in violation of its provisions. Id. § 1319(a)-(c). The CWA also allows private citizens to file civil actions against violators, provided they give the EPA, the relevant state, and the alleged wrongdoer sixty-days' notice prior to filing the lawsuit. Id. § 1365(a)-(b); see Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs , 504 F.3d 634, 637 (6th Cir. 2007) (noting private citizen suits "provide a second level of enforcement" and serve as a check on state and federal governments, who bear the primary enforcement responsibility for prosecuting CWA violations).
We have held that a CWA claim has five elements: "(1) a pollutant must be (2) added (3) to navigable waters (4) from (5) a point source ." Consumers Power Co. , 862 F.2d 580 at 583 (quoting Nat'l Wildlife Fed'n v. Gorsuch , 693 F.2d 156, 165 (D.C. Cir. 1982) ).
B. Factual Background
As noted, the Gallatin plant is adjacent to the Cumberland River, a "water[ ] of the United States." 33 U.S.C. § 1362(7). TVA has two coal ash ponds or impoundments at the Gallatin plant: the Non-Registered Site ("NRS") and the Ash Pond Complex ("Complex"). The NRS is closed, and the Complex is in the process of being closed.
1. The NRS
From 1956 to 1970, the Gallatin plant sluiced CCRs to the NRS, an unlined 65-acre site along the western edge of the river. The NRS is situated atop alluvium (loose soil, silt, clay). By 1973, TVA had dewatered the NRS. TVA closed the NRS in 1998, pursuant to the State of Tennessee's solid waste program. For this reason the NRS does not have an NPDES permit. Instead, the Tennessee Department of Environment and Conservation ("TDEC") regulates the "closed dry ash disposal area" according to its solid waste landfill standards, which include ongoing groundwater monitoring. See Tenn. Code Ann. § 68-211 et seq . Approximately 2.3 million cubic yards of coal ash are stored at the NRS.
Based on expert testimony from both sides, the district court found that "it does *440 appear more likely than not that some portions of [the NRS as well as the Complex] penetrate the water table." The court concluded that the NRS is contaminated; that it leaked historically; that there was "no evidence to suggest that the 'closure' of the site ... wholly stopped the leaking."
2. The Complex
After 1970, TVA began treating its CCR in a series of unlined ponds, collectively known as the Complex. The ponds, which cover roughly 476 acres, treat sluiced wastewater by allowing CCRs to settle before releasing wastewater to the Cumberland River through Outfall 001. Approximately 11.5 million cubic yards of coal ash are stored at the Complex today. The parties agree that the Complex sits atop karst terrain, a landscape characterized by underground sinkholes, fissures, and caves caused by water-dissolving limestone. See 40 C.F.R. § 257.53. Groundwater flows easily through the factures and other conduits created by the dissolved rock.
Historically, the Complex leaked significant amounts of pollutants into the river. Between 1970 and 1978, approximately 27 billion gallons of coal ash wastewater flowed directly from the Complex into the karst aquifer and then into the Cumberland River. The district court found it "beyond dispute that sinkholes have been recently discovered in the area[ ] of the Gallatin plant site" and would likely continue to form, given the nature of karst terrain. Thus, the court concluded that "[i]t is simply implausible, based on the evidence before the Court, that the Complex has not continued to, and will not continue to, suffer at least some leaking through karst features."
3. The Permit
In 1976, the EPA issued an NPDES permit authorizing the Gallatin plant to discharge wastewater from the Complex to the Cumberland River through Outfall 001. Today, TDEC issues and oversees the federal permitting process for the Gallatin plant.[1]
TDEC issued the permit in question ("Permit") on June 26, 2012,[2] after a public comment period. See 40 C.F.R. § 124.8 (requiring the EPA or state authority to issue a fact sheet for every draft permit setting forth "the principal facts and the significant factual, legal, methodological and policy questions considered in preparing the draft permit"); Tenn. Comp. R. & Regs. 0400-40-05-.06 ("Notice and Public Participation"). The Permit establishes effluent limitations, as well as monitoring and reporting requirements for certain pollutants within the wastewater.
Two additional provisions of the Permit are relevant to this lawsuit: (1) the "removed-substances" provision, which prohibits "[s]ludge or any other material removed by any treatment works" from causing "pollution of any surface or subsurface waters," and (2) the "sanitary-sewer overflow" provision, which prohibits the "discharge to land or water of wastes from any portion of the ... treatment system other than through permitted outfalls."
On August 21, 2014 (JX 248), and again on, April 25, 2016 (JX 249, 250), TDEC deemed TVA in compliance with the Permit.
*441 4. Procedural History
Plaintiffs, two Tennessee conservation groups whose members use and enjoy Old Hickory Lake, saw the matter differently. Dissatisfied with the State of Tennessee's enforcement efforts, they brought this CWA citizen suit on April 14, 2015, under to 33 U.S.C. § 1365, alleging that TVA violated the CWA and the Permit based on flows from the NRS and the Complex through hydrologically connected groundwater to the Cumberland River.[3]
On August 4, 2017, the district court entered judgment for Plaintiffs following a bench trial. First, the court ruled as a matter of law that the CWA applies to discharges of pollutants from a point source through hydrologically connected groundwater to navigable waters where the connection is "direct, immediate, and can generally be traced." The district court held that the NRS is a point source because it "channel[s] the flow of pollutants ... by forming a discrete, unlined concentration of coal ash," and that the Complex is also a point source because it is "a series of discernible, confined, and discrete ponds that receive wastewater, treat that wastewater, and ultimately convey it to the Cumberland River."
The court then found as a matter of fact that both the NRS and the Complex are hydrologically connected to the Cumberland River by groundwater. As to the NRS, the court held that "[f]aced with an impoundment that has leaked in the past and no evidence of any reason that it would have stopped leaking, the Court has no choice but to conclude that the [NRS] has continued to and will continue to leak coal ash waste into the Cumberland River, through rainwater vertically penetrating the Site, groundwater laterally penetrating the Site, or both."
The district court similarly found that historical evidence established that the Complex leaked. The court stated that "none of the science presented was capable of definitively identifying when the relevant pollutants entered the water," and that the record was "silent with regard to detailed, credible evidence of whether the undisputed historical leakage is capable of justifying pollutant concentrations in the amounts observed today." However, the court decided that "[o]n balance ... the evidence preponderates toward concluding that the discharges from the ... Complex are either ongoing or intermittent and recurring." The court therefore held that "the unanimous expert testimony is that sinkholes and other drainage features in karst terrain are not mere relics of some past geological event. Rather, the physical properties of the terrain itself make such areas prone to the continued development of ever newer sinkholes or other karst features." Thus, based on the contaminants flowing from the NRS and the Complex, the court found TVA to be in violation of the CWA. The district court further concluded that karst-related leakage from the Complex violated the Permit's removed-substances and sanitary-sewer overflow provisions.
*442 As a remedy the court ordered TVA to "fully excavate" the coal ash in the Complex and the NRS (13.8 million cubic yards in total) and relocate it to a lined facility, rejecting TVA's proposal to dewater and put a cap on the unlined impoundments ("closure-in-place").[4] Although acknowledging that the burden of closure-by-removal "may be great," the court felt that it was "the only adequate resolution to an untenable situation that has gone on for far too long." Because of the costs associated with the injunctive remedy, the court did not assess civil penalties against TVA.
TVA appeals, arguing that the district court (1) erred in holding that the CWA's prohibition of unpermitted point source discharges applies to pollutants that migrate through groundwater to navigable waters; (2) lacked authority to override the TDEC's regulatory decision not to impose NPDES liability for seepage and leakage of coal ash leachate through groundwater at the Gallatin plant in the Permit; and (3) abused its discretion in ordering complete excavation and relocation of the 13.8 million cubic yards of coal ash stored at the Gallatin plant.
III. ANALYSIS
We review a district court's decision to grant a permanent injunction "under several distinct standards." S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers, Local Union 2359 , 186 F.3d 733, 737 (6th Cir. 1999). "Factual findings are reviewed under the clearly erroneous standard, legal conclusions are reviewed de novo , and the scope of injunctive relief is reviewed for abuse of discretion." Id. As always, review of statutory construction is de novo. Bowling Green v. Martin Land. Dev. Co. , 561 F.3d 556, 558 (6th Cir. 2009).
A. Discharges from the NRS and the Complex
TVA first challenges the district court's ruling "that a cause of action based on an unauthorized point source discharge may be brought under the CWA based on discharges through groundwater, if the hydrologic connection between the source of the pollutants and navigable waters is direct, immediate, and can generally be traced." TVA contends that the district court impermissibly expanded CWA liability beyond what Congress authorized, and created an unnecessary conflict with regulation of coal ash under the Resource Conservation and Recovery Act, ("RCRA"), 42 U.S.C. § 6901 et seq ., and the CCR Rule, promulgated under RCRA, 80 Fed. Reg. 21,302 (Apr. 17, 2015).
1. Text and Structure of the CWA
TVA claims that the text and structure of the CWA demonstrate that the phrase "discharge of pollutants" excludes the migration of pollutants through groundwater. Plaintiffs maintain that the district court correctly concluded that the NRS and the Complex are point sources that add coal ash pollutants to the Cumberland River through groundwater with a direct hydrologic connection to the Cumberland River.[5] In finding TVA in violation of the CWA, the district court made two legal conclusions:
*443 first, that coal ash ponds are "point sources"; and second, that surface water pollution via hydrologically connected groundwater is actionable under the CWA. Because we conclude that the hydrological connection theory is not a valid theory of liability, we reverse the district court's finding of liability here.[6]
As we explain in Kentucky Waterways ,[7]
*444 [t]he backbone of [the] argument in favor of the hydrological connection theory is that the relevant CWA provision does not contain the word "directly." Because it only prohibits the discharge of pollutants "to navigable waters from any point source," 33 U.S.C. § 1362(12)(A), [proponents] argue that the CWA allows for pollutants to travel from a point source through nonpoint sources en route to navigable waters. The CWA's text suggests otherwise.
First, the guidelines by which a CWA-regulated party must abide-the heart of the CWA's regulatory power-are known as "effluent limitations." 33 U.S.C. § 1362(11) ; § 1314(b) These are caps on the quantities of pollutants that may be discharged from a point source and are prescribed on an industry-by-industry basis. See 33 U.S.C. § 1314(b). The CWA defines effluent limitations as restrictions on the amount of pollutants that may be "discharged from point sources into navigable waters." Id. § 1362(11) (emphasis added). The term "into" indicates directness. It refers to a point of entry . See Into , Webster's Third New International Dictionary, Unabridged. 2018. Web. 22 Aug. 2018. ("[E]ntry, introduction, insertion."); Into , Oxford English Dictionary (2d ed. 1989) ("Expressing motion to a position within a space or thing: To point within the limits of; to the interior of; so as to enter .") (emphasis added). Thus, for a point source to discharge into navigable waters, it must dump directly into those navigable waters-the phrase "into" leaves no room for intermediary mediums to carry the pollutants.
Moreover, the CWA addresses only pollutants that are added "to navigable waters from any point source." 33 U.S.C. § 1362(12) (emphasis added). Accordingly, the CWA requires two things in order for pollution to qualify as a "discharge of a pollutant": (1) the pollutant must make its way to a navigable water (2) by virtue of a point-source conveyance.
Id . at ----.
Like the defendant utility company in Kentucky Waterways, TVA "is discharging pollutants into the groundwater and the groundwater is adding pollutants to" the Cumberland River. Id. "But groundwater is not a point source. Thus, when the pollutants are discharged to the river, they are not coming from a point source; they are coming from groundwater which is a nonpoint-source conveyance. The CWA has no say over that conduct." Id. For this reason, any alleged leakages into the groundwater are not a violation of the CWA.
Also similar to the plaintiffs in Kentucky Waterways Alliance , Plaintiffs here rely on Justice Scalia's statement in Rapanos v. United States , 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) that "[t]he [CWA] does not forbid the 'addition of any pollutant directly to navigable waters from any point source,' but rather the addition of any pollutant to navigable waters.' " Id. at 743, 126 S.Ct. 2208 (plurality opinion) (quoting 33 U.S.C. § 1362(12)(A) ). But, as we discuss in Kentucky Waterways , that quote has been taken out of context, and the courts and litigants that rely on it in support of the hydrological connection theory
have erred for a number of reasons. Not the least of which is that Rapanos is not binding here: it is a four-justice plurality *445 opinion answering an entirely different legal question. See id. at 739, 126 S.Ct. 2208 (concluding that certain wetlands and intermittent streams did not themselves fall within the CWA's definition of navigable waters). In any event, when Justice Scalia pointed out the absence of the word "directly" from § 1362(12)(A), he did so to explain that pollutants which travel through multiple point sources before discharging into navigable waters are still covered by the CWA. Id. at 743, 126 S.Ct. 2208 ("[T]he discharge into intermittent channels of any pollutant that naturally washes downstream likely violates [the CWA], even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between. (emphasis omitted) ). Justice Scalia's reference to "conveyances"-the CWA's definition of a point source-reveals his true concern. He sought to make clear that intermediary point sources do not break the chain of CWA liability; the opinion says nothing of point-source-to-nonpoint-source dumping like that at issue here. And the facts in Rapanos confirm this to be true. The three wetlands that the Supreme Court defined out of the CWA in Rapanos were all linked to navigable waters by multiple different point sources (drains, ditches, creeks, and the like). Id. at 729-30, 126 S.Ct. 2208. Thus, our holding today does not stand in conflict with the Rapanos plurality.
Ky. Waterways All. , --- F.3d ----, No. 18-5115, at ----. We further concluded that the CWA's other provisions and corresponding federal environmental laws strengthened this reading, which brings us to TVA's next argument-that the district court's hydrological connection holding directly conflicts with RCRA and the CCR Rule.
2. Statutory Context
Along with protecting the "Nation's waters," the CWA also protects the primary rights and responsibilities of the States to regulate pollution. 33 U.S.C. § 1251(a), (b). Congress specifically designed other environmental statutes to partner with the CWA:
RCRA is designed to work in tandem with other federal environmental protection laws, including the CWA. See 42 U.S.C. § 6905(b) ("The [EPA] shall integrate all provisions of [RCRA] for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of ... [the CWA]."). For that reason, RCRA and the CWA should be read as complementary statutes, each addressed at regulating different potential environmental hazards. Cf. Erlenbaugh v. United States , 409 U.S. 239, 243-44, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972) (statutes that "pertain to the same subject" may be treated "as if they were one law," because "whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject").
Ky. Waterways All ., --- F.3d ----, No. 18-5115, at ----. Moreover, allowing the CWA to cover pollution of this sort would disrupt the existing regulatory framework. Because "RCRA explicitly exempts from its coverage any pollution that is subject to CWA regulation," id ., 42 U.S.C. § 6903 (27), reading the CWA in this way would remove coal ash treatment and storage practices from RCRA's coverage. "But coal ash is solid waste, and RCRA is specifically designed to cover solid waste." Id . Thus, the proposed CWA reading would be "problematic." Id.
Even "more problematic"
is the fact that, pursuant to RCRA, the EPA has issued a formal rule that specifically *446 covers coal ash storage and treatment. See 80 Fed. Reg. 21,302 (Apr. 17, 2015) (the "CCR Rule"). The CCR Rule was designed to regulate, among other things, coal ash ponds. Id . at 21,303. Yet because the EPA issued the CCR Rule under RCRA, reading the CWA to cover coal ash ponds would gut the rule. Adopting Plaintiffs' reading of the CWA would mean that any coal ash pond with a hydrological connection to a navigable water would require an NPDES permit, thus removing it from RCRA's coverage and with it, the CCR Rule. Almost all coal ash ponds sit near navigable waterways because of the large amounts of water needed to operate coal-fired power plants. As such, adopting Plaintiffs' interpretation of the CWA would leave the CCR Rule virtually useless. We decline to interpret the CWA in a way that would effectively nullify the CCR Rule and large portions of RCRA.
Id. , --- F.3d ----, No. 18-5115, at ---- (citation omitted).
The CCR Rule "specifically addresses the 'disposal of coal [ash] as solid waste under [RCRA].' " Id . at ----, (quoting 80 Fed. Reg. at 21,302). The CCR Rule therefore "requires any existing unlined CCR surface impoundment that is contaminating groundwater above a regulated constituent's groundwater protection standard to stop receiving CCR and either retrofit or close." Id . (quoting 80 Fed. Reg. at 21,302). The rule also establishes minimum criteria for CCR surface impoundments, requires groundwater monitoring, and further demands corrective action where groundwater contamination exceeds accepted levels. Id. (citing 80 Fed. Reg. at 21,396 -408). In other words, the CCR Rule, not the CWA, is the framework envisioned by Congress (by delegating rulemaking authority to the EPA through RCRA) to address the problem of groundwater contamination caused by coal ash impoundments.
For these reasons, we hold that the district court erred in adopting Plaintiffs' theory that the CWA prohibits discharges of pollutants through groundwater that is hydrologically connected to navigable waters.
B. Removed-Substances and Sanitary-Sewer Overflow Provisions
Because the district court also held that TVA violated the CWA based on two other provisions of the Permit, our inquiry is not yet at an end. TVA challenges the district court's holdings that TVA violated the Permit's removed-substances and sanitary-sewer overflow provisions based on Plaintiffs' demonstration of unauthorized discharges of coal ash from the Complex. NPDES permits are interpreted like contracts. Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty. , 268 F.3d 255, 269 (4th Cir. 2001).
1. Removed-Substances Provision
The removed-substances provision is found in Part I of the Permit, which sets forth "Effluent Limitations and Monitoring Requirements." It provides that "TVA Gallatin Fossil Plant is authorized to discharge" enumerated pollutants "through Outfall 001," including "ash transport water" and "ash sluice water leakage." These discharges are "limited and monitored by the permittee" according to specified "parameters," limitations on quantities, rates, and concentrations of specified chemicals. Part I.A(c) by its terms, is an "[a]dditional monitoring requirement[ ] and condition[ ]applicable to Outfalls 001, 002, and 004." It states that "[s]ludge or any other material removed by any treatment works must be disposed of in a manner, which prevents its entrance into or pollution of any surface or subsurface waters."
*447 Noting that some of the ash waste produced as a result of the sluicing process escapes to the Cumberland River, the district court held simply that "Plaintiffs' demonstration of unauthorized discharges from the Ash Pond Complex" established "a violation of the facial terms of Part I.A(c)." But karst-related leaks are not discharges from "Outfalls 001, 002, and 004." Thus, this provision simply does not apply, and was therefore not violated by the conduct at issue in this case.
2. Sanitary-Sewer Overflow Provision
The sanitary-sewer overflow provision, found in Part II of the Permit, prohibits "the discharge to land or water of wastes from any portion of the collection, transmission, or treatment system other than through permitted outfalls." The district court held that, "[a]s with [the removed-substances provision], this allegation is resolved by Plaintiffs' demonstration that TVA improperly discharged coal ash waste through leaks to the ... Complex."
But this provision also cannot be reasonably read to cover karst-related leaks. While the Permit does not define sewage, it treats it as a distinct type of "Pollutant" distinct from "industrial wastes, or other wastes." See 33 U.S.C. § 1362(6) (defining "pollutant" as including "sewage" as well as "chemical wastes"). This distinction is consistent with the EPA definition of sanitary-sewer overflow as involving "[a]n untreated or partially treated sewage release from a sanitary sewer system." The EPA's NPDES Permit Writers' Manual states that "occasional, unintentional spills of raw sewage from municipal sanitary sewers occur in almost every system. Such types of releases are called sanitary sewer overflows (SSOs)." The district court, by treating coal ash wastewater as a sanitary-sewer overflow, ignored the plain meaning of sewage. Further, the Permit treats these types of pollutants differently. Industrial wastes like "discharge ash transport water" and "ash sluice water leakage" are authorized with limitations while "Sanitary Sewer Overflows are prohibited." Thus, karst-related leakage cannot be a violation of this provision.
Because the plain language of these two provisions does not apply to karst-related discharges from the Complex, there is no violation of the Permit. Neither provision supports the district court's injunction. Given this conclusion, we need not address TVA's arguments that that the collateral attack and permit shield doctrines shield it from liability.
C. Injunctive Relief
Without CWA liability, the district court's injunction has no foundation. Its imposition was therefore an abuse of discretion.
IV. CONCLUSION
As the district court rightly concluded, "an unlined [coal] ash waste pond in karst terrain immediately adjacent to a river" that leaks pollutants into the groundwater is a major environmental problem that the Permit does not adequately address. But the CWA is not the proper legal tool of correction. Fortunately, other environmental laws have been enacted to remedy these concerns. For these reasons, as well as those articulated in Kentucky Waterways , we REVERSE the judgment of the district court imposing CWA liability on TVA.
DISSENT

The EPA delegated its permitting authority to TDEC in 1986. TDEC issued its first NPDES permit to TVA for the Gallatin plant, in 1993.

The Permit expired on May 31, 2017, and was administratively continued until a new permit was issued. On May 1, 2018, TDEC issued a renewed NPDES Permit for the Gallatin plant. It became effective June 1, 2018, and is valid for five years.

On January 7, 2015, the State of Tennessee filed an original enforcement action under applicable state statutes, the Tennessee Solid Waste Disposal Act and the Tennessee Water Quality Control Act, in state court. See State of Tenn, et al. v. TVA , No. 15-0023-IV (Davidson Cty. Chanc. Ct. Jan. 7, 2015). Plaintiffs intervened in that action. The state action remains pending, although TVA removed it to federal court in August 2017. See Slate ex rel. Slatery v. TVA , No. 3:17-cv-01139, ECF No. 1 (M.D. Tenn. Aug. 19, 2017).
In the present case the district court applied CWA's diligent prosecution bar, see 33 U.S.C. § 1365(b)(1)(B), and limited the trial's scope to the allegations it deemed non-overlapping with the state enforcement action.

Closure-in-place involves dewatering an impoundment and capping it with a geosynthetic liner, borrow material, soil, and vegetation to prevent water from flowing into and through it. Closure-by-removal involves dewatering the CCR, excavating it, drying it sufficiently to move it, and then moving it to a permitted and lined landfill. A third option, "on-site closure," strikes a middle ground: it requires removal to a lined impoundment at the same location.

Unlike the plaintiffs in Kentucky Waterways , Plaintiffs here do not argue that groundwater itself is a point source.

Although we do not base our decision today on TVA's first argument, we note that the Fourth Circuit recently held that a landfill and settling pond did not serve as point sources simply because they allowed arsenic from coal ash to leach into groundwater and then to navigable waters. See Sierra Club v. Va. Elec. & Power Co. , No. 17-1952, 903 F.3d 403, 2018 WL 4343513 (4th Cir. Sept. 12, 2018) :
We conclude that while arsenic from the coal ash stored on Dominion's site was found to have reached navigable waters-having been leached from the coal ash by rainwater and groundwater and ultimately carried by groundwater into navigable waters-that simple causal link does not fulfill the Clean Water Act's requirement that the discharge be from a point source. By its carefully defined terms, the Clean Water Act limits its regulation under § 1311(a) to discharges from "any discernible, confined and discrete conveyance ." 33 U.S.C. § 1362(14) (emphasis added). The definition includes, "but [is] not limited to[,] any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft." Id .; see also Consol. Coal Co. v. Costle , 604 F.2d 239, 249-50 (4th Cir. 1979), rev'd in part sub nom . EPA v. Nat'l Crushed Stone Ass'n , 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980) (finding that "discharges which are pumped, siphoned or drained" fall within the definition of discharges from a "point source"); Appalachian Power v. Train , 545 F.2d 1351, 1373 (4th Cir. 1976) (concluding that "point source" pollution does not include "unchanneled and uncollected surface waters"). At its core, the Act's definition makes clear that some facility must be involved that functions as a discrete, not generalized, "conveyance."
"Conveyance" is a well-understood term; it requires a channel or medium-i.e., a facility-for the movement of something from one place to another. See Webster's Third New International Dictionary 499 (1961); The American Heritage Dictionary of the English Language 291-92 (1976); see also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians , 541 U.S. 95, 105, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004) ("[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters' " (emphasis added) ). If no such conveyance produces the discharge at issue, the discharge would not be regulated by the Clean Water Act, though it might be by the RCRA, which covers and regulates the storage of solid waste, including coal ash, and its effect on groundwater.
903 F.3d at 410-11, 2018 WL 4343513, at *5. The court felt that
[t]his understanding of the Clean Water Act's point-source requirement is consistent with the larger scheme of pollution regulation enacted by Congress. In regulating discharges of pollutants from point sources, Congress clearly intended to target the measurable discharge of pollutants. Not only is this revealed by the definitional text of "point source," but it is also manifested in the effluent limitation enforcement scheme that the Clean Water Act employs. The National Pollutant Discharge Elimination System Program and § 1311's enforcement scheme specifically rely on "effluent limitation[s]"-restrictions on the "quantities, rates, and concentrations" of pollutants discharged into navigable waters. 33 U.S.C. § 1362(11) (defining "effluent limitation"). And state-federal permitting programs under the Clean Water Act apply these precise, numeric limitations to discrete outfalls and other "point sources," see [EPA v. California ex rel. Res. Control Bd ., 426 U.S. [200,] 205-08 [96 S.Ct. 2022, 48 L.Ed.2d 578] (1976), at which compliance can be readily monitored. When a source works affirmatively to convey a pollutant, the concentration of the pollutant and the rate at which it is discharged by that conveyance can be measured . But when the alleged discharge is diffuse and not the product of a discrete conveyance, that task is virtually impossible.
Id. 411, 2018 WL 4343513, at *6.

In Kentucky Waterways , the district court dismissed the plaintiffs' CWA claim, rejecting their argument that pollution via hydrologically connected groundwater could support CWA liability.