604 So.2d 630 (1992)
In the Matter of DRAVO BASIC MATERIALS COMPANY, INC.; Pontchartrain Materials Corporation; and Louisiana Materials Company, Applications for Water Discharge Permits.
No. CA-90-1525-R.
Court of Appeal of Louisiana, First Circuit.
June 29, 1992.
*632 James A. Burton, J. Thomas Hamrick, Jr., and Susan F. Clade, Simon, Peragine, Smith & Redfearn, New Orleans, for appellant Dravo Basic Materials Co., Inc.
John R. Peters, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for appellant Pontchartrain Materials Corp.
Robin B. Durant, in pro per.
Gordon Green and John B. King, Office of Legal Affairs and Enforcement, and John N. Kennedy, Sp. Counsel to the Governor, Office of the Governor, Baton Rouge, for appellee State of La. through the Dept. of Environmental Quality.
Richard P. Ieyoub, Atty. Gen., Ian Douglas Lindsey, Asst. Atty. Gen., Baton Rouge, for intervenor State of La. through the Dept. of Justice.
Michael Osborne and Christopher Gobert, Osborne & McComiskey, New Orleans, for intervenor Save Our Coast.
Michael D. Conroy, Metairie, for intervenor Lake Pontchartrain Basin Foundation.
Before COVINGTON, C.J., and LeBLANC and WHIPPLE, JJ.
WHIPPLE, Judge.
Dravo Basic Materials Company (hereinafter referred to as DRAVO) and Pontchartrain Materials Corporation (hereinafter referred to as PMC) appeal the decision of the Assistant Secretary of the State of Louisiana, Department of Environmental Quality, Office of Water Resources, denying their applications for water discharge permits. We affirm.
An adjudicatory hearing was held before Herman Robinson, an administrative law judge, to consider issuance of water discharge permits to the companies; the proposed regulatory control strategy suggested by DEQ to insure compliance with the water quality criteria regarding turbidity; and issues relative to the "IT" questions.[1]
The Attorney General of the State of Louisiana, the Lake Pontchartrain Basin Foundation, and Save Our Coast, Inc., intervened in the proceedings. The hearing lasted approximately three weeks, from October 23, 1989 through November 13, 1989, and included a public comment hearing. Numerous experts testified on the various aspects of shell dredging in Lake Pontchartrain. At the request of the administrative law judge, a tour of dredging activities on the Lake was conducted.
On May 10, 1990, the administrative law judge reported his findings of fact and conclusions of law to the assistant secretary of the Office of Water Resources. On June 22, 1990, the assistant secretary, Maureen O'Neill, after a review of the permit applications and record found that the proposed regulatory control strategy was inadequate and that shell dredging cannot be undertaken in a manner which will adequately protect the environment.[2]
*633 Therefore, the water discharge permits required for shell dredging were denied.
DRAVO and PMC appeal.[3] On appeal, appellants specify twelve assignments of error. The assignments of error can be grouped into four issues presented for review by this court, which are as follows:
1. Whether the companies are required to obtain state water discharge permits for their shell dredging operations in Lake Pontchartrain;
2. Whether the assistant secretary's decision was made pursuant to unlawful procedures in violation of constitutional, statutory and/or regulatory provisions in that the scope of the adjudicatory hearing exceeded the inquiry DEQ is statutorily authorized to make in connection with applications for waste water discharge permits;
3. Whether the assistant secretary's findings contain a cost-benefit analysis as required by the Louisiana Supreme Court in Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984).
4. Whether, on the basis of all of the evidence in the record, the assistant secretary, acting on behalf of the Department of Environmental Quality was manifestly erroneous in her findings of fact and conclusion that the companies should be denied water discharge permits.

SHELL DREDGING AND THE PERMIT REQUIREMENT
DRAVO and PMC urged at all stages of these proceedings that they were not required to obtain a discharge permit for their dredging activities because they do not introduce any pollutants into Lake Pontchartrain. In support of this contention, appellants rely on the provisions of LSA-R.S. 30:2073(4)[4], Louisiana Administrative Code Title 33:IX.1105[5], and federal case law[6]. We find no merit in this argument.
LSA-R.S. 30:2075 provides:
No person shall conduct any activity which results in the discharge of any substance into the waters of the state without the appropriate permit or license required under the regulations of the commission adopted pursuant to this Chapter.
LSA-R.S. 30:2076 provides, in pertinent part:
A. (1) No person shall discharge or allow to be discharged into any waters of the state:
(a) Any waste or any other substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation.
Appellants contend that they are not required to obtain water discharge permits because, under the definition of "water pollution" found in LSA-R.S. 30:2073(4), the dredging operations do not introduce any pollutants into Lake Pontchartrain. We do not agree. As the hearing transcript shows, the introduction of bottom sediments and dredge spoil is the introduction of a substance that was not present in the water column prior to the dredging operation. *634 The new substance introduced certainly has the tendency to degrade the chemical, physical, biological, or radiological integrity of the waters. This was illustrated in the volumes of expert testimony introduced in these proceedings.
The discharge of this substance is further governed by LAC 33:IX.301, which states in pertinent part:
B. Without first obtaining a LWDPA permit from the Office of Water Resources,... no person shall:
1. discharge or allow to be discharged any pollutants into the waters of the state from any facility or activity ...
The regulations define the terms "discharge" and "pollutants" in LAC 33:IX.107.[7]
Additionally, LAC 33:IX.301C7 specifically provides:
Specific types of facilities or activities which require a permit include, but are not limited, to, the following:
* * * * * *
7. discharge of waters/sediments resulting from the commercial dredging of shell or other natural resources.
Thus, it is obvious from the plain wording of the statutes and regulations that shell dredging activities require a permit from the Office of Water Resources.
Finally, in support of their contention that their activity does not require a permit, appellants cite the case of National Wildlife Federation v. Consumers Power Company, 862 F.2d 580 (6th Cir.1988). This case is not controlling authority in this matter, legally or factually.
The National Wildlife Federation case involved the Federal Clean Water Act as opposed to the Louisiana statutes and regulations which are at issue here. The case is also factually distinguishable.
National Wildlife Federation involved the destruction and discharge of fish and other organisms when water passed through turbines at a power generating plant. The Court of Appeals held that the activity did not require a permit because the movement of pollutants already in the water was not an addition of pollutants to navigable waters. However, in that case, the fish and organisms in question were actually in the water column before the occurrence of the activity in question. Here, the dredging discharges solid material that is previously below the surface of the lake bed, which is then pumped up and introduced into the water column. The solid material found in the water column as a result of the dredging operations would not be found in the water column under normal conditions, whereas the fish entrails at issue in the National Wildlife Federation case would be.
Louisiana's environmental programs are frequently modelled in part on federal programs, so federal and state cases interpreting those statutes may provide guidance in applying the Louisiana statutes. However, Louisiana's regulatory framework is also based on state constitutional provisions and mandates and the public trust doctrine. Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984).
Thus, we find no merit in appellants' argument and conclude that water discharge permits are required for shell dredging operations in Louisiana.

THE ASSISTANT SECRETARY'S DECISION AND THE SCOPE OF THE ADJUDICATORY HEARING
Appellants contend on appeal that the assistant secretary's decision was made pursuant to unlawful procedures in violation of constitutional, statutory and/or regulatory provisions in that the scope of the *635 adjudicatory hearing exceeded the inquiry DEQ is statutorily authorized to make in connection with applications for waste water discharge permits.
Appellants cite LSA-R.S. 30:2075 as the basic statutory authority under which DEQ issues water discharge permits. LSA-R.S. 30:2075 prohibits any activity which results in the discharge of any substance into the waters of the state without the appropriate permit.
LSA-R.S. 30:2076 provides, in part:
A. (1) No person shall discharge or allow to be discharged into any waters of the state:
(a) Any waste or any other substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation; ...
Appellants read these provisions as limiting DEQ's inquiry to the discharge caused by shell dredging and contend that these statutes prohibit the DEQ from considering the overall impact of the activity.
We disagree. The DEQ's inquiry is not limited to the discharged substance. Rather, the proper focus is on the entire activity which results in the discharge, as well as the effect of the discharge on the environment in general, as the entire activity of shell dredging affects the quality of the water column.
This approach is in accord with the secretary's statutory and constitutional role as public trustee of the environment. A public trust for the protection, conservation, and replenishment of the environment, including the healthful, scenic, historic, and esthetics quality of the environment is mandated by the Louisiana Constitution.[8] The DEQ must additionally comply with statutory standards in considering whether to grant or deny permits. LSA-R.S. 30:2014(A) provides, in pertinent part:
A. All permits ..... authorized by this Subtitle shall be granted by the secretary... The secretary shall act as the primary public trustee of the environment, and shall consider and follow the will and intent of the Louisiana Constitution and Louisiana statutory law in making any determination relative to the granting or denying of permits.... (Emphasis added).
Thus, considering the constitutional and statutory mandate that the DEQ act as the public trustee of the environment, we cannot conclude that the decision rendered or the scope of the adjudicatory hearing exceeded the authority vested in the assistant secretary acting on behalf of the DEQ.

RISK-BENEFIT ANALYSIS
DRAVO and PMC argue that the assistant secretary failed to conduct the proper risk-benefit analysis required by Save Ourselves, 452 So.2d 1152. We find no merit in this argument.
At the hearing, DRAVO and PMC submitted evidence and offered the testimony of Dr. William Barnett, an economist. Dr. Barnett testified regarding the economic impact to the state in the event the shell dredging industry was closed. His calculations and reports included direct losses, such as loss of jobs to individuals in the industry and indirect losses, consisting of job losses to those in related industry, loss of tax revenues by state and local governments, as well as financial losses occasioned by state and local governments being obligated to pay unemployment benefits. Dr. Barnett's calculations included capital losses, such as the use of dredging equipment. It is obvious that the assistant secretary considered this testimony in her analysis. See Assistant Secretary's Finding of Fact Nos. 100, 103, 104.
The Lake Pontchartrain Basin Foundation offered the testimony of Dr. John Elstrott, an economist. His testimony addressed what he perceived as flaws in Dr. Barnett's economic analysis. Dr. Elstrott concluded that Dr. Barnett's testimony failed to consider "opportunity costs", that *636 is, what is given up by continuing to allow shell dredging in Lake Pontchartrain. He concluded that the shell dredging industry robbed future generations of the use of Lake Pontchartrain in exchange for short-term benefit to the industry. His calculations included values attributable to increased local quality of life related to recreational uses of the lake, increased tourism, potential increases in property values, increased seafood industry, increased tax revenues and the intangible value attributable to the state's enhanced reputation for being environmentally conscious.
Harm to the environment cannot always be quantified as easily as the economic benefits derived from taxes and salaries. The economic benefits derived from the industry must be balanced against our need for protection of natural resources. See In the Matter of CECOS International, Inc. ("CECOS") Livingston Facility Permit Application, 574 So.2d 385 (La.App. 1st Cir.1990), writ denied, 576 So.2d 18 (La. 1991).
Save Ourselves does not require a particular type of risk-benefit analysis or that all the balancing be articulated and explained in detail in the secretary's decision. CECOS, 574 So.2d at 392. Here, the assistant secretary obviously addressed whether environmental costs outweigh the social and economic benefits by acknowledging the conflicting testimony of the economic experts in her findings of fact. The assistant secretary's analysis of the risks and benefits can be reasonably discerned. Based on a review of the entire record, we cannot say that the assistant secretary abused her discretion in determining that the risk and gravity of the possible harm to Lake Pontchartrain outweighed the social and economic benefits of shell dredging. Neither can we conclude that the assistant secretary failed to make the proper analysis. Thus, we find no merit in the argument advanced by appellants.

THE DEQ'S FACTUAL FINDINGS AND DENIAL OF THE PERMITS
The record in this matter consists of volumes of testimony, and numerous studies and reports entered into evidence. There is a broad range of expert testimony and opinions contained in the record. The administrative law judge and the assistant secretary reviewed the record and made findings of fact and conclusions of law, based on their review. Specifically, the assistant secretary concluded that shell dredging could not be conducted in a manner that would afford protection for the environment. Therefore, the discharge permits were denied.
The manifest error test is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion. Save Ourselves, 452 So.2d at 1159.
DRAVO and PMC urge that many of the assistant secretary's findings of fact are manifestly erroneous. We have carefully read and reviewed the entire record in this matter. We conclude that her findings are amply supported by the record and are often the result of the assistant secretary's decision to credit the testimony of one expert over another.
The manifest error standard of review dictates that a court of appeal may not set aside findings of fact unless they are clearly wrong, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. Esco, 549 So.2d 840 (La.1989). The rule that questions of credibility are for the trier of fact applies to evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990). An administrative agency may use its own judgment in evaluating evidence as to a matter within its expertise. It may accept or reject, in whole or in part, testimony of an expert which is, generally speaking, an expression of opinion *637 on the matter under consideration. Summers v. Sutton, 428 So.2d 1121 (La. App. 1st Cir.1983).
Inferentially, the assistant secretary chose to accept the opinions of some experts and to reject the opinions of others. Conflicting views presented by the experts were both permissible, and the reasoning advanced by each of the experts was not patently unsound. Therefore, the assistant secretary's choice between experts cannot be manifestly erroneous. Additionally, LSA-R.S. 49:964(G)(6) dictates that where the agency has the opportunity to view the witnesses and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.[9] We have considered each of the findings that the appellants contend are erroneous and conclude that there is ample support by credible testimony in the record for each of these findings. Thus, they are not manifestly erroneous.
The assistant secretary made findings of fact regarding Rangia clams found in Lake Pontchartrain and their importance to the lake and its benthic community, which appellants contend are manifestly erroneous.[10] We disagree.
Appellants argue there is no evidence that shell dredging has caused a reduction in the Rangia clam population throughout the lake, stating that it is not possible to quantify what percentage of responsibility for the decline of the adult Rangia clam is attributable to shell dredging. However, there is ample evidence contained in the record to support these findings. Most convincing is the testimony of Mr. Dennis Chew, a biologist, who, when questioned by the administrative law judge concerning shell dredging as a major factor in the decrease in the abundance of live clams, testified as follows:
[T]he EIS very clearly indicates that the reason you don't have many large live clams in the part of the Lake that's dredged is because of, you, [sic] know, the frequency of the dredging activity precludes reestablishment of large live beds of Rangia in the open Lake because it takes an extended period of time for those to become established ...
Additionally, the Attorney General's office offered the testimony of Dr. Rezneat Darnell, who was qualified as an expert in estuarine ecology, specifically the ecology of Lake Pontchartrain. Dr. Darnell conducted studies of Lake Pontchartrain in the 1950's and again in 1987. He concluded:
Where [in the 1950's] I had collected 100 per square meter before of adults, I was either getting none or maybe one [in June of 1987]. So, there certainly does *638 seem from this to have been a dramatic drop in the population of adults.
This testimony supports the assistant secretary's findings that the population of Rangia clams decreased. Further, there was testimony that this decrease was in fact attributable to the shell dredging occurring in the lake.
These findings are further supported by the testimony of Dr. Marion Fannaly. He testified that shell dredging had changed the consistency of the bottom material in the lake. When questioned regarding the impact of changes in the lake bottom on aquatic life, Dr. Fannaly responded:
The more recent work done by several different people indicates a complete absence of large living Rangia from the open areas of the Lake that are dredged. There's been different hypothesis to account for this. I think one researcher concluded that the sediments were too soft to support the large clams, that the literally sank down into it faster than they could climb back out....
The fact that many commercially harvested species of fish in Lake Pontchartrain feed on the Rangia clams is supported by the testimony of several experts.
The assistant secretary's findings of fact also focus on turbidity in the lake and its effect on the lake's environment.[11] Appellants contend that the assistant secretary manifestly erred in concluding, in Finding of Fact No. 31, that shell dredging contributes to lakewide turbidity levels. They argue that the scientific evidence does not support the conclusion that there has been a lakewide increase in turbidity levels.
Appellants introduced the testimony of Dr. Maureen Mulino, an estuarine biologist. Her opinion was that shell dredging has a temporary effect on turbidity, but has no long-term effect on turbidity. However, there was also contrary testimony by other experts that there is increased turbidity levels lakewide and that shell dredging contributes to this increased turbidity. There is evidence in the record establishing the detrimental effect caused by this increase in turbidity levels.
The DEQ introduced the testimony of Dr. Marion Fannaly, also an expert in estuarine biology. Dr. Fannaly testified that the grassbeds in the lake are a crucial part of the estuarine environment because they are an area of high primary productivity which is the basic source of food for organisms in the lake. In his opinion, the increase in turbidity was, for the most part, caused by shell dredging. Turbidity, in turn, caused the reduction of grassbeds, due to impingement upon the ability of light to penetrate to the bottom. As he related, under these conditions, the grassbeds cannot flourish. Dr. Fannaly also acknowledged that areas of grassbeds have decreased drastically over the last twenty to thirty years.
The attorney general's office offered the testimony of Dr. Darnell, an estuarine ecologist with particular expertise in the ecology of Lake Pontchartrain. Dr. Darnell testified that the lake is far more turbid than it was in the 1950's. He concluded that the implication of this high turbidity was reduction in light penetration in the lake which had an adverse effect upon production of photoplanton, a major food source for many species in the lake. There is support in the record for the finding that the dredge plumes harm fish and other organisms in the lake.
Appellants also contest several findings by the assistant secretary regarding bottom sediments in Lake Pontchartrain and *639 the effect of shell dredging upon those sediments.[12] They argue that the assistant secretary is manifestly erroneous in finding that shell dredging produces a fluid mud spoil which has a lowered bulk density and that the spoil is easily resuspended into the water column by wind and wave action.
These findings of fact are supported by the testimony of Dr. Len Bahr, the DEQ's expert in coastal ecology. Dr. Bahr testified that the bottom of the lake is less consolidated due to shell dredging, and that because the bottom is less consolidated, strong winds or storms make the water more easily upset and more turbulent. He concluded that the more fluid the bottom is, the more easily disturbed it is.
Moreover, Dr. Walter Sikora, a specialist in marine benthic ecology and assistant professor at Louisiana State University, testified that the modification of the sediment caused very easy resuspension by wind and wave action. He concluded that this is a very significant system-wide effect of shell dredging activity.
Finally, the appellants challenge several findings of the assistant secretary concerning heavy metals in the bottom sediments and the effect that shell dredging upon these sediments.[13]
Appellants argue that this finding is erroneous because, in another finding of fact, the assistant secretary acknowledged that shell dredging contributes no toxic materials to the lake, and because she acknowledged expert testimony to the effect that resuspension of heavy metals in the water column could be a short-lived impact. Appellants urge that these inconsistencies render her findings of fact manifestly erroneous. We note that the expert testimony offered on this issue was extremely conflicting.
Appellants rely on the testimony of Dr. Wayne Isphording, a geology professor and expert in geochemistry and sedimentology, who testified that in his opinion, dredging is incapable of releasing large amounts of metals into the water column because the metals are held in the sediments in stable forms. He concluded that the metals were structurally "locked up" and held or bonded to the clays, and were totally unavailable to the biota and could only be freed if heated to 1,000 degrees centigrade and subjected to various conditions that do not occur in the natural environment of Lake Pontchartrain.
Appellants contend that this testimony is uncontradicted. We disagree. The assistant secretary found that there is a possibility that heavy metals could be resuspended in the water column and acknowledged the possibility of biomagnification. There is ample evidence in the record to support the finding that dredging may have dangerous effects to the water column, biota and people who consume the biota. For example, Dr. Paul Kemp, a marine scientist and sedimentologist, acknowledged that Dr. Isphording's characterization and analysis of the data, and conclusion that heavy metals posed no threat in Lake Pontchartrain, was not universally shared. Dr. Kemp testified concerning other studies that had been conducted concerning heavy metals and their effect on the marine environment. Dr. Kemp recognized that sediment concentrations of heavy metals is of major concern because it affects the biota and people who consume biota. As he noted, recent data indicates possible problematic contamination with selected heavy metals.
*640 Dr. Sikora also testified regarding PCB's in the bottom sediments of Lake Pontchartrain, stating:
[W]e were concerned about toxic materials in the form of organic toxics, pesticides and other toxic organic compounds that may have been in the sediments and we did find, I think, very significantly that Lake Pontchartrain sediments contained high levels of PCSs, very high levels, actually, and PCBs are a very dangerous group of compounds that are known to bioaccumulate. They have potential carcinogenic effects, mutagenic effects, and they have been demonstrated to have very pronounced ecological effects ...
In general, for every finding of fact made by the assistant secretary, the appellants point to conflicting expert testimony in the record which they contend refutes these findings. While their experts presented differing opinions on the effects of the shell dredging activity, it is within the province of the trier of fact to determine which testimony is more credible. Under the manifest error standard of review, this choice of experts by the trier of fact, who had the opportunity to view the witness and evaluate his demeanor, demands great deference by this court.
We disagree with appellants' claim that the assistant secretary ignored large bodies of evidence found in the record. Rather, we find that the findings of fact represented a lawful exercise of her right and duty in deciding to credit the testimony of one or more experts over others. Additionally, in some instances, the findings are supported by the record when viewed as a whole, rather than by any one portion of the record. We have reviewed each of the findings of fact which the appellants contend are manifestly erroneous. From our review of the testimony given by the many experts herein, we are unable to conclude that these findings are unsupported by the record. The assistant secretary's findings are not manifestly erroneous or clearly wrong.
Appellants contend that the assistant secretary was arbitrary, capricious and manifestly erroneous in rejecting several of their proposed findings of fact and proposed conclusions of law and in adopting the proposed findings of fact and conclusions of law submitted by intervenors.
The assistant secretary in this case rendered a decision denying water discharge permits to the appellants. Our duty as a reviewing court is to give a full review to the facts of the particular case and determine the validity and reasonableness of the order. Summers v. Sutton, 428 So.2d 1121 (La.App. 1st Cir.1983). If the decision has a rational basis in the administrative record, this court must uphold that decision. Our judicial review requires this court to determine if the order is supported by a reasonable interpretation of the evidence. If so, the order is accorded great weight and will not be reversed or modified in the absence of a clear showing that the administrative action is arbitrary and capricious. Summers, 428 So.2d at 1129.
We have already concluded that the findings of fact made by the assistant secretary are not manifestly erroneous and are fully supported by the record. Our next inquiry is solely whether there is a rational connection between the facts as found and the order issued. See Save Ourselves, 452 So.2d 1152.
In Save Ourselves, the Louisiana Supreme Court dictated that the agency can not assume that its duty is merely to adhere to its own regulations rather than to the constitutional and statutory mandates. The agency has a duty to see that the environment will be protected to the fullest extent possible consistent with the health, safety and welfare of the people.
The decision rendered in this case is an exercise by the assistant secretary of her constitutionally mandated duty to protect the environment and to act as a public trustee. The decision flows rationally from the facts as found, which are fully supported by the record and not manifestly erroneous. In rendering the decision, the assistant secretary had the discretion to adopt or reject proposed findings of fact *641 and conclusions of law, and we cannot say that she was manifestly erroneous or arbitrary and capricious in doing so. The assistant secretary has articulated findings of facts and her decision flows rationally from those findings.
Her conclusions, drawn from the facts and based upon her review of the record, are also supported by specific sections of the record and are often the result of accepting one credible expert over another. We find that her exercise of the authority granted to her by law was not a clearly unwarranted exercise of discretion. CECOS, 574 So.2d 385.
The record reveals that the assistant secretary considered alternate projects, alternate sites and mitigation measures. The record also shows that the department made an attempt to quantify environmental costs and weighed them against social and economic benefits of shell dredging activity.
From our review, we conclude that the assistant secretary considered these areas and fulfilled her duty to adhere to the DEQ's own regulations as well as constitutional and statutory mandates. In doing so, the assistant secretary found that shell dredging activities cannot be conducted in a manner that will afford protection to the environment. On that basis, the discharge permits were denied. We find that she was not manifestly erroneous in her findings, nor was she arbitrary and capricious in concluding that permits should be denied. Thus, appellants' contentions are without merit.

CONCLUSION
We conclude that shell dredging activity requires a Louisiana Water Discharge Permit from the Office of Water Resources. We also find that the scope of the adjudicatory hearing and the decision rendered by the assistant secretary on behalf of the DEQ did not exceed the scope of its authority. The assistant secretary properly conducted a risk-benefit analysis in considering the environmental costs of the activity balanced against the social and economic benefits derived therefrom. Based on our review of the entire record of these proceedings, including the various studies, reports and evidence presented, we find that the assistant secretary was not manifestly erroneous in her findings of fact, nor was she arbitrary and capricious in her decision to deny the water discharge permits. Accordingly, we affirm her decision.
Costs of this appeal are assessed against the appellants, Dravo Basic Materials, Inc. and Pontchartrain Materials Corporation.
AFFIRMED.
NOTES
[1] The "IT" questions were formulated by the Louisiana Supreme Court in Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984). As noted by the Court, the following issues must be considered and addressed by the DEQ in performing its duty to insure that the environment is protected:

1. Have the potential and real adverse environmental effects of the activity been avoided to the maximum extent possible?
2. Does a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the activity demonstrate that the latter outweigh the former?
3. Are there alternative projects which would offer more protection to the environment than the proposed activity without unduly curtailing non-environmental benefits?
4. Are there any alternative sites which would offer more protection to the environment than the proposed activity site without unduly curtailing non-environmental benefits?
5. Are there mitigating measures which would offer more protection to the environment than the activity proposed without unduly curtailing non-environmental benefits?
Title 33, Section IX.303(F)(1)-(5) of the Louisiana Administrative Code also requires that these questions be addressed by the applicant in a permit application.
[2] The Department of Environmental Quality (DEQ) was created and designated the primary agency in the state concerned with environmental protection and regulation. LSA-R.S. 30:2011A.(1). The secretary of DEQ has the power to grant or deny permits. LSA-R.S. 30:2011D.(2). However, the power to grant or deny certain permits may be delegated by the secretary to the assistant secretary subject to his continuing oversight. LSA-R.S. 30:2014A.
[3] Louisiana Materials Company did not file an appeal herein.
[4] LSA-R.S. 30:2073(4) provides:

`Water pollution' means the introduction into waters of the state by any means, including dredge and fill operations, of any substance in concentrations which tend to degrade the chemical, physical, biological, or radiological integrity of such waters, including, but not limited to, the discharge of brine from salt domes which are located on the coastline of Louisiana and the Gulf of Mexico into any waters off said coastline and extending therefrom three miles into the Gulf of Mexico.
[5] The Louisiana Administrative Code, Title 33, Part IX, Chapter Eleven contains the DEQ's Water Quality Regulations, particularly DEQ's Water Quality Standards. Appellants rely on LAC 33:IX.1105, which contains the same definition of water pollution as found in LSA-R.S. 30:2073(4).
[6] National Wildlife Federation v. Consumers Power Company, 862 F.2d 580 (6th Cir.1988).
[7] LAC 33:IX.107 provides:

Dischargemeans the placing, releasing, spilling, percolating, draining, pumping, leaking, seeping, emitting, disposing, bypassing or other escaping of pollutants in the air, waters, subsurface water or ground as the result of a prior act of omission ...
Pollutantmeans any substance introduced into the waters of the state by any means that would tend to degrade the chemical, physical, biological or radiological integrity of such environment.
[8] La. Const. art. IX, Sec. 1 provides: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy."
[9] LSA-R.S. 49:964(G)(6) provides:

The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
* * * * * *
(6) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. In the application of the rule, where the agency has the opportunity to judge of the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
[10] Finding of Fact No. 41The blue crab which is commercially harvested in Lake Pontchartrain utilizes Rangia clams as its principal food source. However, they are not entirely dependent upon clams and do eat other organisms.

Finding of Fact No. 42Black drum and sheepshead fish use large Rangia clams as a food source. These species of fish are commercially harvested in Lake Pontchartrain.
Finding of Fact No. 43Up through the 1950's the open part of the Lake had large numbers of live clams. Dredging intensity increased in the 1960's and 1970's.
Finding of Fact No. 44There has been a reduction in abundance of large Rangia clams in the Lake since the 1950's.
Finding of Fact No. 47In areas of the Lake that are disturbed frequently by shell dredging, the establishment of widespread communities of large adult clams is precluded. Some clams may be smothered by the layer of fluid mud left by the dredges. Also, shell dredging has seriously hampered the ability of juvenile Rangia clams to survive in the middle of the Lake.
Finding of Fact No. 48The substrate or bottom alteration that is associated with shell dredging (the digging up the bottom and putting back the spoil) is in a general sense, a habitat change that is destructive to the Rangia clam population.
[11] Finding of Fact No. 31While dredging does not occur in grassbeds, shell dredging contributes to lakewide turbidity levels, and overall lakewide turbidity levels have adversely affected the grassbeds.

Finding of Fact No. 33Shell dredging produces a fluid mud spoil which has a lowered bulk density. The spoil is easily resuspended into the water column by wind and wave action.
Finding of Fact No. 55The Lake today is much more turbid than it was when Dr. Darnell conducted his study. The Lake's current turbidity problems are caused by clay particles rather than by organic material or nutrients. Once the clay particles are stirred and suspended, they tend to remain suspended longer.
Finding of Fact No. 92The U.S. Army Corps of Engineers concluded in a study of the Lake that dredging causes short term turbidity, increases the levels of suspended sediments in the vicinity of the dredge and may contribute to the long term increase of lakewide turbidity.
[12] Finding of Fact No. 33Shell dredging produces a fluid mud spoil which has a lowered bulk density. The spoil is easily resuspended into the water column by wind and wave action.

Finding of Fact No. 57Dr. Darnell found that as he got further away from the shore, the consistency of the bottom muds was considerable less consolidated than it had ever been. The bottom was no longer firm like it had been.
Finding of Fact No. 62There has been a dramatic shift from hard to soft bottoms due to the absence of clam shells and shell hash. There has also been a dramatic reduction in the available food supply for bottom-feeding fishes, shrimp and crabs.
[13] Finding of Fact No. 98Contaminants such as heavy metals which are found in bottom sediments may be resuspended in the water column as a result of dredging and may result in the biomagnification of those contaminants in the aquatic food chain.