JaLOTTINGER, Chief Judge.
Slidell Sportsman’s League, Honey Island Swamp Tours, Inc. and Pearl River Canal Property Owners Association (collectively referred to as Opponents, hereinafter), appeal the decision of the Louisiana Department of Environmental Quality (DEQ) to issue a revised water quality certification to the United States Army Corps of Engineers (Corps).
In May of 1993, the Corps applied for a revision of its 1986 water quality certification for dredging on the West Pearl River. The proposed revision requires maintenance dredging of a seven foot deep navigation *641 channel from the mouth of the river to mile 52.2. An estimated 1.4 million cubic yards of coarse sand and gravel would be dredged annually to maintain the channel.
On June 24, 1994, the DEQ issued the revised certification.[1] Following the grant of the certification, Opponents’ request for an adjudicatory hearing was denied. Pursuant to La.R.S. 30:2024(0), Opponents filed this appeal specifying six assignments of error.
(A) DEQ violated mandatory procedural requirements of the Environmental Regulatory Code and the Administrative Procedures Act.
(B) The DEQ’s decision violated Louisiana water quality criteria, Louisiana’s anti-degradation policy, the CWA and EPA regulations.
(C) DEQ’s decision was affected by an erroneous interpretation of the Natural and Scenic Rivers Act.
(D) DEQ’s revised certification was arbitrary, capricious, characterized by an abuse of discretion or [a] clearly unwarranted exercise of discretion.
ls(E) DEQ’s revised certification was manifestly erroneous in view of the reliable, probative and substantial evidence on the record.
(F) DEQ violated its constitutional duties as trustee.
STANDARD OF REVIEW
The Louisiana Supreme Court has articulated the following standard of judicial review for agency decisions.
[A] reviewing court may affirm the decision of the agency or remand the ease for further proceedings; or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record.
American Waste and Pollution Control Company, 93-3163, p. 18 (La. 9/15/94); 642 So.2d 1258, 1265 (quoting Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152,1158 (La.1984)).
The reviewing court must determine whether the agency’s decision violates constitutional or statutory provisions, or whether they are affected by an error of law. It must also consider whether procedural due process was afforded to those affected by the decision. Following these determinations, the reviewing court must consider whether the agency abused its discretion in exercising its authority and whether its findings of fact were manifestly erroneous in light of the record. Save Ourselves, 452 So.2d at 1158-59.
In the instant case, Opponents’ arguments touch upon all six criteria. But because we find merit in Opponents’ fourth assignment of error, we pretermit discussion of the remaining arguments.
ASSIGNMENT OF ERROR TV
In assignment of error four, Opponents assert that the DEQ’s decision to issue the revised water quality certification was arbitrary, capricious, and characterized |4by an abuse of discretion or a clearly unwarranted exercise of discretion. Specifically, Opponents contend that because of the possibility of sediment contamination, the DEQ’s decision to grant the certification was an abuse of discretion.
In the Corps’ Final Environmental Impact Statement (FEIS), it recognized that dredging activities which would result in “[t]he resuspension of bottom sediments which may *642 also result in the release of toxic substances into the water column.” Water quality standards for toxic substances are set forth in LAC 33:IX.1113(B)(5) which states:
Toxic Substances
Shall not be present in quantities that alone or in combination will be toxic to plant or animal life. Concentrations of persistent toxic substances for which no numerical criteria are given in the Standards shall not exceed the 96-hour LC50/100 (one one-hundredth of the 96-hour LC50). Persistent toxic substances are defined herein as refractory substances subject to very limited or no biodegradation and/or detoxification and subject to food chain bioaccumulation; they include but are not limited to pesticides, PCB’s and heavy metals that are designated by EPA as priority pollutants. Concentrations of non-persistent, biodegradable toxic substances for which no numerical criteria are given in the standards, shall not exceed the 96-hour LC50/10 (one-tenth of the 96-hour LC50). Bioassay techniques comparable with those given in the latest edition of Standard Methods for the Examination of Water and Wastewater will be used in evaluating toxicity using specific methods, dilutions, and species of aquatic animals best suited to the area of concern.
To grant a water quality certification the DEQ must verify that the proposed activity complies with applicable water quality standards. LAC 33:IX.1505. Thus, the DEQ must verify that the Corps’ proposed dredging activity complies with the water quality standards set forth in LAC 33:IX.1113(B)(5).
Prior to 1985, there was an inadequate amount of data available to the Corps to characterize sediment quality along the West Pearl River. Therefore, the Corps collected sediment samples in 1985,1986 and 1990. In all, twenty-six samples were collected and analyzed. Nineteen of the samples were taken from the navigation project right-of-way. See appendix. The sediment samples were analyzed for priority | spollutants and dioxin. In its FEIS, the Corps stated that the analysis results indicate that the sediment “should not pose any environmental problems” or “threat[s] to water quality.” As illustrated by the appendix, the proposed project requires dredging at twenty-one sites along the West Pearl River. Dredging at each of these sites will result in the introduction of new substances into the water column. There is a possibility that these new substances will carry toxic chemicals into the West Pearl River.[2]
Sediment samples were taken from only five of the twenty-one proposed dredging sites. See appendix. While these five samples were analyzed for toxic substances, the contents of the sediment at the remaining sixteen sites remain unknown.
There is insufficient evidence in the record to conclude that sediment, which will be introduced into the West Pearl River during dredging operations, poses no environmental problems or threats to water quality. Without this evidence, the DEQ could not verify that the water quality standards set forth in LAC 33:IX.1113(B)(5) for toxic substances were met by the Corps. Because the DEQ could not verify that these standards were met, we must conclude that it abused its discretion in granting the certification.
CONCLUSION
For the foregoing reasons, the Louisiana Department of Environmental Quality’s decision to grant the revised water quality certification to the United States Army Corps of Engineers is reversed and remanded. Costs of this appeal are assessed against the DEQ in the amount of $348.00.
REVERSED AND REMANDED.
*643 APPENDIX
[[Image here]]

. The DEQ issued the certification, stating that it interposed no objections to the project revisions, provided that:
1)Turbidity during dredging in "waters of the state” is kept to a practicable minimum.
2) The distribution of flow between the East and West Pearl Rivers is not changed.
3) The suspended solids in the runoff from the spoil disposal area are kept to a practicable minimum.

. In Dravo Basic Materials Company, Inc., 604 So.2d 630, 633-34 (La.App. 1st Cir.1992), we recognized that "the introduction of bottom sediments and dredge spoil is the introduction of a substance that was not present in the water column prior to the dredging operation. The new substance introduced certainly has the tendency to degrade the chemical, physical, biological, or radiological integrity of the waters.”